UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHILIP JON FAHRNER,

                Petitioner,              Case Number 2:09-CV-11908
                                                      Honorable Paul D. Borman

v.

PERCY CONERLY,

                Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS,
AND (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**

**I. Introduction**

      Petitioner, Philip Fahrner, is serving a 9-to-15 year sentence for his 2006 Grand Traverse

Circuit Court conviction for first-degree child abuse, MICH. COMP. LAWS 750.136b(2).

Petitioner asserts that he was denied the effective assistance of counsel at trial. The Court will

deny the petition because the state court adjudication of his claim was not contrary to, or did not

involve an unreasonable application of, clearly established Supreme Court law.

**II. Background**

      At Petitioner's jury trial, Amy Strang testified that she was the mother of the

complainant, Cameron, who was eleven months old at the time of the incident. She was engaged

to Petitioner.   On July 22, 2005, Petitioner was watching Cameron while Strang was at work.

Petitioner called Strang at work and told her that Cameron had fallen in the living room and had

hit his head on the coffee table and had also hit his head on the floor. He told her that a bruise

was starting to form on the side of his head. Petitioner said Cameron had hit his head pretty

badly and was not crying or moving.

When Strang arrived home, Cameron was lying on the couch.  An ambulance arrived and Strang rode with Cameron to the hospital in Traverse City.  Petitioner told doctors that Cameron had hit his head and thrown himself back.  Strang saw a bruise on the left side of Cameron's face.  Strang asked Petitioner if Cameron had hit anything else or if anything else had happened, and Petitioner denied that anything else had happened.  The doctors performed emergency surgery on Cameron to relieve the pressure on his brain.

Cameron was transferred to DeVos Hospital in Grand Rapids early the next morning.  The doctors told Strang that Cameron would not survive.  Later that day, a detective came into Cameron's room and told Strang that Petitioner had told him that he had done it.

Cameron was hospitalized until August 12, 2005. At the time of trial, Strang and Cameron were living with her mother.  Cameron could make noises, but he could not eat or cry.  She was told that Cameron could die at anytime, and doctors expected that he would never talk or move or open his eyes again.

Rachel Lile, Petitioner's neighbor, testified that sometime after 9:30 p.m. on the night of the incident, she was getting ready for bed when Petitioner knocked on her door.  Petitioner was holding Cameron and asked her if she could help him.  Petitioner told her that Cameron had fallen and had hit his head on the coffee table.  Petitioner handed Cameron to Lile.  Lile asked if Petitioner had called 9-1-1.  Petitioner looked at his cell phone as though he had planned to call, but when he did not dial, Lile called 9-1-1 herself.

Munson Hospital Emergency Room Nurse Christine Johnson testified that Petitioner initially stated that he did not know what had happened to Cameron.  Petitioner then stated that Cameron fell forward and  hit his face on a coffee table and then fell backward onto the carpeted floor.  In Johnson's experience, Petitioner's explanation was inconsistent with Cameron's

2

"severe" injuries.  Johnson called the police.

Dr. John Kopec testified that he worked in the pediatric intensive care unit at DeVos hospital in Grand Rapids.  He described Cameron as suffering from a very large subdural hematoma.  The doctors who initially operated on Cameron removed approximately one-third of Cameron's skull and drained that blood.  An MRI confirmed that Cameron suffered a massive injury to the right side of his brain which left that hemisphere "pretty much dead."  There was also injury to the left side of the brain.  In Kopec's opinion, Cameron's injuries were not the result of a chronic condition because of the rapid rate of deterioration in his condition.

Kopec noted that Cameron also had a large handprint bruise on the left side of his face and a fractured right clavicle.  Cameron's fractured clavicle did not come from hitting a door. Rather, there was direct trauma to his chest which broke his clavicle, resulting in a depressed fracture.  Cameron also had numerous bilateral retinal hemorrhages.

In Kopec's opinion, Cameron's injuries were not consistent with the type of injury described by Petitioner.  He opined that Cameron's injuries were more consistent with a child involved in a high-speed car accident or falling several stories out of a window.  Kopec believed that it was possible for an adult to hit or throw Cameron hard enough to cause the injuries.

Detective Paul Postal testified that he went to the hospital in Grand Rapids with Detective Nathan Ritter.  Petitioner told them that while he was making dinner, Cameron hit his head on a coffee table and threw himself backward onto the carpeted floor.  When Petitioner picked up Cameron, Petitioner began to walk to the kitchen and Cameron threw up on him. Petitioner went to get a washcloth and Cameron began stiffening.  Petitioner called his mother, who told him to go to a neighbor's house to get help. Petitioner put this version of events in a written statement.

3

Postal showed the statement to Kopec and then went back to talk to Petitioner.  Postal told Petitioner that his statement was not consistent with Cameron's injuries.  Petitioner explained that besides hitting his head on the table and floor, he had also dropped Cameron onto the floor while carrying him into the kitchen and then hit Cameron's head on the door frame when he carried him out of the house.  After hearing Petitioner's second statement, Postal again spoke with Kopec, who told Postal that Cameron's injuries were not consistent with that story either.  Kopec also told Postal that there was a hand mark developing on Cameron's left cheek.

When Postal confronted Petitioner about the hand mark on Cameron's face, Petitioner put his hand to his chest, began crying, and stated: "I hit him."  Petitioner then described how Cameron refused to take his bottle so Petitioner slapped him across the face.   Petitioner then described how Cameron subsequently hit his head on the table and floor, and how Petitioner tossed him when Cameron threw-up on him.

Petitioner's parents came to the hospital break room where Postal was interviewing Petitioner.  Petitioner's mother asked what was going on because this was "just an accident." Petitioner responded: "No, there is more."  Postal left Petitioner with his parents.  When Postal returned, Petitioner admitted hitting Cameron "hard."  Petitioner then gave the police an audio-recorded statement, and he was placed under arrest.

Dr. AnnaMaria Church testified that she was the Interim Director of the Child Protection Team at DeVos Children's Hospital.  After being qualified as an expert, Church testified that Cameron's injuries "were much too significant to have been caused by a drop" and, instead, resulted from "considerable force."  Church opined that someone slapped Cameron in the face, shook him, causing the retinal hemorrhages, and then threw him against the floor or a wall with sufficient force to break his clavicle and cause a subdural hematoma.  Cameron's injuries were

4

not consistent with being hit by a door or being dropped onto a linoleum floor. Cameron's injuries could have been accidentally inflicted if he had fallen out of a three-story apartment building and hit cement. Church did not diagnose Shaken Baby Syndrome. According to Church, if Cameron had had a subdural hematoma from being born, it would have dissipated within four to six weeks.

Dr. Cynthia Smith testified that she was Cameron's pediatrician. Cameron was healthy before July, 2005, but he was now tube fed. Smith opined that one day Cameron might be able to suck and swallow from a bottle or spoon, but he would never pick up a spoon and feed himself. Cameron had severe brain damage and would never talk or walk. In Smith's opinion, it was still very likely that Cameron would die from complications from his injuries.

Petitioner called Gary Kiernan, the first EMT to arrive at Lile's house, as a witness for the defense. Kiernan saw that Cameron had a contusion above his left eyebrow, but he did not see any other marks. Timothy Shaffer, a volunteer fireman, responded to Lile's house and assisted one of the EMTs. He testified that Cameron was not crying, his eyes were open, and he had "a goose egg bump on the left side of" his forehead. Shaffer did not see a mark on Cameron's face. Kyle Stites, an EMT and a firefighter, saw that Cameron had a goose egg on his forehead and was completely motionless and unresponsive though his eyes were open.

Petitioner's mother Faith Fahrner testified that she was a nurse. On the night of the incident, Petitioner called her and told her that Cameron had fallen and hit his head on the coffee table and then hit his head on the floor. Petitioner asked her what he should do, and Faith told him to get a cool cloth and try to get some ice on the bump. A couple of minutes later, Petitioner called again, reporting that "it's not good," and that Cameron was throwing up. Faith told him to keep Cameron's airway open. When Petitioner told Faith that Cameron's legs were stiffening,

5

she told him to go and get help.  Faith denied Postal's account of how Petitioner told her at the hospital that it was not an accident and that there was more.

Petitioner testified in his own defense.  Petitioner admitted that he slapped Cameron in the face, but not hard, when Cameron would not take his bottle. He testified that Cameron then went to the coffee table, hit his head on it and fell back, hitting the carpet.  Cameron was crying and Petitioner picked him up.  Petitioner went to the kitchen and Cameron threw up on him. Petitioner started to clean Cameron off with his hand when Cameron threw up again.  Petitioner accidentally dropped Cameron, who fell onto to floor, hitting the back of his head.  On the way out of the house, Petitioner testified that the door hit Cameron in the head.  Petitioner testified that he did not initially tell the doctors or the police everything that had happened because he was scared and did not want them to think that he was careless.

Mark Southby, Petitioner's employer, testified that Petitioner was a great employee, having worked for him for one and one-half years.  To Southby's knowledge, nothing stressful had happened that day at work.  Arnie Besonen, Petitioner's former teacher, testified that Petitioner had a reputation for being a truthful person.  Jamie Miller was married to Petitioner's best friend and also testified that Petitioner had a reputation for being truthful.  James Miller also testified that Petitioner had a reputation for being truthful.  Petitioner's grandfather Robert Brinkman also testified that Petitioner had a reputation for truthfulness.

The jury found Petitioner guilty as charged, and he was sentenced to 9-to-15 years in prison.

Petitioner filed a claim of appeal in the Michigan Court of Appeals, which raised the following claims: (1) Petitioner is entitled to an evidentiary hearing on his claim that his trial counsel was ineffective; (2) the trial court erred in allowing admission of the opinion testimony

6

of Dr. Church as to the cause of the complainant's injuries; (3) a new trial should be granted in light of newly discovered expert testimony; and (4) the sentencing guidelines were scored incorrectly.

The Michigan Court of Appeals remanded the case to the trial court to hold a hearing on Petitioner's ineffective assistance of counsel claim.

At the hearing, Penny Darnell testified that she was a paralegal for Petitioner's trial counsel, Jeffery Slocombe. According to Darnell, she performed from 3½ to 4 hours each day working on Petitioner's case. She talked about the case with Slocombe every day from July through November, 2005. Darnell estimated that Slocombe spent a couple of hours each week getting ready for trial.

Darnell testified that Slocombe obtained medical records from Munson and DeVos Hospitals. Slocombe prepared Faith Fahrner to testify about a pre-existing injury occurring weeks before the incident. Faith wanted an expert to review the conclusions of the physicians at the Munson and DeVos Hospitals. Slocombe contacted the Technical Advisory Service For Attorneys (TASA), which led him to a potential expert.

While Slocombe was working on Petitioner's case, he was being sued for legal malpractice in Kalamazoo County. He did not tell Petitioner or his mother of the lawsuit. According to Darnell, Slocombe lied to Petitioner's parents about his preparations for the case. Darnell testified that she and Slocombe argued about the case.

Faith testified that on the morning of Petitioner's preliminary examination, she met Slocombe at the courthouse. Within six to eight weeks, Faith became uncomfortable with Slocombe because he told her that he couldn't get all of Cameron's medical records. Slocombe gave what he had to Faith, including some of Cameron's pediatric care records up until October

7

31, 2005, but she wanted Cameron's growth records, CAT scans, and MRI films. Faith told Slocombe that they had seen Cameron a week before July 22, 2005, and he was "lethargic," "not eating," and "not playing."

Faith also talked to Slocombe about hiring an expert, and she was with him when he talked with one. The expert had reviewed the records submitted by Slocombe, and he said that he would not testify for Petitioner. Faith wanted to hire someone else, and Slocombe agreed to try to find another expert. Slocombe told Faith that before talking to the expert, he had talked to a couple of local doctors, who also had declined to testify on Petitioner's behalf.

Petitioner testified that his parents hired Slocombe. For the first month, Slocombe came to see Petitioner twice each week, but his visits subsequently decreased. Slocombe told Petitioner that he was trying to get Cameron's complete medical records. They discussed the idea that Cameron had a "pre-existing injury."

Slocombe testified that he was a licensed attorney. Between ninety and ninety-five percent of his practice involved criminal defense. He had handled many murder and manslaughter cases. Slocombe did not have his time records for Petitioner's case, but he recalled that he had spent a substantial amount of time working on it. Slocombe visited Petitioner weekly. Slocombe testified that he researched shaken baby syndrome. He obtained articles from a case being handled by F. Martin Tieber, and he received many articles from Faith. Slocombe estimated that he had read about fifty articles in preparation for the case.

Faith and Petitioner told Slocombe that they thought Cameron might have had a pre-existing injury. However, when he talked to the expert he was referred to by TASA, that possibility was ruled-out given the severity and quick onset of the injuries. Slocombe's trial defense was to argue that Cameron's injuries were accidentally inflicted. This was consistent

8

with what Petitioner told him had happened the first time that they met.

In March, 2005, Slocombe was ordered in his malpractice case to pay 25% of all fees he earned to Samuel Field, another attorney. Slocombe denied litigating Petitioner's case off the books, and he denied that he wanted to resolve Petitioner's case quickly for personal reasons.

Slocombe testified that he had all of Cameron's medical records and forwarded them to the experts he contacted. None of the experts he consulted had asked for additional records such as X-rays, CT scans or MRIs. Slocombe sent Cameron's medical records to Dr. Gary Hessler, a local general practitioner, with the hope that he could refer Slocombe to another expert. Hessler shopped the case around, but no local doctor would touch it. Hessler sent the case to someone he knew in Detroit, but that person's findings would not be helpful to Petitioner.

Slocombe arranged to contact Dr. Rosenberg through TASA. Slocombe testified that he talked to Rosenberg four or five times and Faith was only present for one of the conversations. Slocombe could not use Rosenberg because his testimony would have been very damaging to Petitioner's defense.

The prosecutor obtained a letter from Doctor T.C. Schermerhorn, Cameron's operating neurologist, addressing the findings of Petitioner's proposed new expert opinions. Schermerhorn stated that the CT scan showed "mixed density" as well as "hypodense" blood above the "hyperdense clotted blood." He opined that the decreased density can also "represent hyperacute or active bleeding as well as trapped cerebral spinal fluid." Regarding the issue of whether there was "one large bleeding source" which suggested that "the underlying trauma was not severe," Schermerhorn opined that even though there was an injury to a major vein, it did not indicate a less severe mechanism of injury.

Following the hearing, the trial court put its findings of fact and conclusions of law on

9

the record.  The court concluded that Slocombe's performance was not deficient.  The court

denied Petitioner's motion for a new trial.  Thereafter, the Court of Appeals affirmed Petitioner's

conviction in an unpublished opinion.  *People v. Fahrner*, 2007 Mich. App. LEXIS 2861 (Mich.

Ct. App. Dec. 27, 2007).  Petitioner subsequently filed an application for leave to appeal in the

Michigan Supreme Court, but it was denied by standard order. *People v. Fahrner*, 481 Mich. 878

(2008).

### III. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA").  Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only

if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law

or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable

application" occurs when "a state court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case." *Id*. at 409.  A federal habeas court may not "issue the

writ simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

10

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for

11

ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5
(1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in
federal court, a state prisoner is required to show that the state court's rejection of his claim "was
so lacking in justification that there was an error well understood and comprehended in existing
law beyond any possibility for fairminded disagreement." *Id.*, at 786-787.

## IV. Discussion

Petitioner claims that his trial counsel provided ineffective assistance.  The claim is
comprised of three sets of allegations.  First, Petitioner asserts that his trial attorney failed to
conduct basic research regarding shaken baby cases and failed to get the full medical file for the
complainant.  According to Petitioner, these failures left his trial counsel unprepared to
effectively cross-examine the prosecution's expert witnesses regarding the cause of the
complainant's injuries and whether their severity necessarily meant that they were the result of
intentional conduct.  Second, Petitioner asserts that his counsel labored under a conflict of
interest because he was distracted by personal issues.  Petitioner notes that his counsel had been
ordered to pay a portion of his income as the result of a malpractice suit, and that he perpetrated
frauds in civil court and bankruptcy court regarding his finances. Petitioner asserts that this gave
counsel an incentive to keep Petitioner's case "off the books" and hurry it through court.  He
claims that as a result of his counsel's personal troubles, counsel even advised Petitioner to plead
guilty at preliminary exam on the false premise that this would preclude future murder charges.
Finally, Petitioner asserts that his counsel was ineffective for failing to secure a defense expert to
counter the prosecution's experts.  He alleges that the TASA-referred expert that counsel
contacted, Dr. Rosenberg, was a well-known prosecution expert who was unlikely to give
counsel a favorable opinion.  The experts located by Petitioner during his state court appeal, on

12

the other hand, opined that there was no scientific basis for the prosecution's experts conclusion that the complainant's injuries required extreme force. One of the new experts, in fact, opined that a review of the medical records showed that the complainant had an old head injury that could have re-bled and caused the brain injury after a relatively mild trauma.

The trial court held an evidentiary hearing on these allegations, after which it determined that trial counsel did not perform deficiently. The decision was affirmed by the Michigan Court of Appeals, as follows:

> Defendant first argues that his counsel was ineffective in part because he was distracted from fully representing defendant by his own personal legal issues. Defendant further argues that counsel did not conduct adequate research to effectively defend the case, and that he unlawfully delegated said research to his paralegal, whom he neglected to supervise. Defendant does not cite specific examples of how counsel improperly delegated research, but states that the paralegal would be willing to testify as to these alleged improprieties.
> In order "to find that a defendant's right to [the] effective assistance of counsel was so undermined that it justified reversal of an otherwise valid conviction, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial." *People v. Pickens*, 446 Mich 298, 302-303 (1994). The defendant must further demonstrate a reasonable probability that, but for counsel's error, the result of the proceedings would have been different, and that the attendant proceedings were fundamentally unfair or unreliable. *People v. Rodgers*, 248 Mich.App. 702, 714 (2001) (citations and emphasis omitted). But, effective assistance of counsel is presumed and the defendant bears a "heavy burden" of proving otherwise. *Id.*

> With regard to defendant's claim that defense counsel did not vigorously defend his case because of his issues with the bankruptcy court, defendant states that the United States Supreme Court has held that an attorney is presumptively ineffective when he labors under an actual conflict of interest. In support of this claim, defendant cites the Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984); however, defendant misrepresents the Court's holding. In *Strickland*, the Court stated that "prejudice is presumed when counsel is burdened by an actual conflict of interest." *Id*. at 692. The Court found that a conflict of interest occurs in situations where counsel has breached the "duty of loyalty," but cautioned that prejudice will be "presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id*. at 692, quoting

13

*Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980).  Defendant has not met the burden set forth by the Court in *Strickland*.

Defendant states that he was prejudiced by counsel's interest in litigating his case "quickly and quietly" so as to escape the notice of his lawful creditors.  However, defendant does not provide evidence for this claim, nor does he show that his defense was hampered in any way by counsel's ostensibly unrelated professional or financial problems.  Defendant's trial was litigated over three days, and defense counsel presented witnesses and cross-examined the prosecution's witnesses.  There is no evidence in the record that the trial should have gone on longer but for defense counsel's negligence and desire to hurry the case to its conclusion.  In *People v. Smith*, 456 Mich. 543, 557 (1998), our Supreme Court held that

> there is no automatic correlation between an attorney's theoretical self-interest and an ability to loyally serve a defendant. . . . [W]e recognize the potential for an attorney's self-interest to conflict with the representation of a defendant and that in such a case a finding of ineffective assistance of counsel would be warranted. If a convicted defendant believes that his attorney's representation was below an objective standard of reasonableness, the appropriate procedure is to seek a *Ginther* hearing.

In the instant case, a *Ginther* hearing was held, and the trial court made a decision on the record that counsel was not presumptively ineffective based on his personal issues with creditors, because there was no actual conflict of interest involved in hiding money from creditors and effectively representing defendant.  This finding is not clearly erroneous and, accordingly, defendant has not established an ineffective assistance of counsel claim based on the purported conflict of interest.

Defendant also argues that his counsel was ineffective because he did not conduct adequate research to effectively defend the case, and because he delegated his research duties to an unsupervised paralegal.  The issue of defense counsel's preparation was also addressed at the *Ginther* hearing, with the court making extensive findings on the record regarding counsel's performance at trial.  The court stated in regard to defense counsel's cross-examination of one of the prosecution's medical experts, "[t]hese are not questions asked by somebody who failed to prepare on the issue of infant death due to blows or being shaken.  He obviously had done some preparation on the subject."  The court also found that counsel's opening statement and closing argument "reflect[ed] preparation and thought as to how to argue the case."  Defendant does not offer any evidence that the trial court's findings were in error.  Thus, his claim that he was denied the effective assistance of counsel fails. *See Pickens*, *supra* at 302-303.

14

*Fahrner*, 2007 Mich. App. LEXIS 2861, *1-5.

The Michigan Court of Appeals addressed the expert witnesses discovered by Petitioner's appellate counsel in the context of Petitioner's free-standing claim that he was entitled to a new trial in light of this newly discovered evidence:

> Next, defendant argues that he is entitled to a new trial because "critical evidence" was not presented to the jury for its deliberation, and new evidence has been discovered that was not available prior to trial. After review for an abuse of discretion of the trial court's decision to deny defendant's motion for a new trial, we disagree. *See People v. Cress*, 468 Mich. 678, 691 (2003).

> At the hearing on his motion for new a trial, defendant's appellate counsel cited reports from his experts that found that the complainant's victim had "mixed density blood" in his system following his admission to the hospital. According to defendant's experts, this condition indicated the presence of both old and new injuries. The court noted that a physician who had operated on the victim attributed the mixed fluids to the presence of spinal cord fluid in his blood, not to an old injury; however, appellate counsel argued that whatever the explanation for the fluid, the matter should have been submitted to the jury. On appeal, defendant argues that the reports of his experts should be submitted to the court as part of a second motion for a new trial.

> Our Supreme Court has stated that in order "[f]or a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) 'the evidence itself, not merely its materiality, was newly discovered'; (2) 'the newly discovered evidence was not cumulative'; (3) 'the party could not, using reasonable diligence, have discovered and produced the evidence at trial'; and (4) the new evidence makes a different result probable on retrial." Cress, supra at 692, quoting *People v. Johnson*, 451 Mich. 115, 118 n. 6 (1996). Defendant has not met the burden required for any of the four elements of the test.

> First, defendant has not shown that the evidence is newly discovered. Defendant alleges that the victim's x-rays and brain images were not given to the defense until after trial. Defendant does not claim, however, that he was unable to access these medical records prior to trial. Second, this purported newly discovered evidence was cumulative with regard to defendant's claim that the subdural hematoma suffered by the victim was a re-bleed of an old injury in that Dr. John Kopec did acknowledge during defense counsel's cross-examination that possibility. Third, as mentioned above, there is no indication that defendant could not have produced this evidence during trial. Finally, in light of these circumstances, a different result on retrial is not probable. In addition to the fact that the alleged evidence of a re-bleed was available during trial, ample evidence

15

was provided at trial suggesting that defendant was responsible for the child's injuries. Admission of the experts' reports would not negate the testimony from the investigating officer regarding defendant's evolving stories of how the child's injuries occurred, nor would it likely override defendant's testimony about how those injuries occurred.

Incidentally, defendant also argues on appeal that other "critical evidence" was not presented to the jury and that evidence presented by the prosecution was not effectively challenged by defense counsel. Therefore, defendant argues, he should be afforded an opportunity to go before the lower court for an evidentiary hearing to consider the "several flaws in the State's [medical] evidence" cited by defendant's "multiple experts." This argument is both vague and unsubstantiated by defendant's brief and the record. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mudge v. Macomb Co*, 458 Mich. 87, 105 (1998). Thus, we reject this claim.

*Fahrner*, 2007 Mich. App. LEXIS 2861, *8-11.

This decision was not contrary to, and did not involve an unreasonable application of, the clearly established constitutional standard for adjudicating ineffective assistance of counsel claims. To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test. First, he must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "*Strickland's* test for prejudice is a demanding one. The

16

likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011)(quoting *Richter*, 131 S. Ct. at 792).

## A.  Failure to adequately prepare for trial

Petitioner's first set of allegations of ineffective assistance allege that his trial counsel did not adequately prepare to confront the prosecution's experts by conducting enough research on shaken baby cases and failing to obtain all of the complainant's medical records.

It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384(1986) (quoting *Strickland*, 466 U.S. at 690).  "In any ineffectiveness case, a particular decision to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004.  A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

The claims of inadequate investigation and preparation were explored in depth at the state court evidentiary hearing.  Petitioner's mother testified that she provided Slocombe with 20 to 25 articles about shaken baby cases and talked to him about them.  Slocombe testified that he did research, read approximately 50 articles, and had Petitioner's case reviewed by several

doctors, including Dr. Rosenberg, whom he found through TASA. His paralegal testified about the extensive research she did on Petitioner's case on a daily basis and how she also discussed the case with Slocombe on a regular basis. The testimony of these witnesses was accepted by the state trial court. Petitioner has not offered any reason, let alone a reason supported by clear and convincing evidence as required by 28 U.S.C. §2254(e), to show that the testimony is untrue.

Based on Slocombe's extensive investigation and preperation, he formed the opinion that he could not reasonably challenge the case on the grounds that the complainant's injuries were the result of a minor trauma causing a re-bleed of an old injury. The multiple experts he contacted simply would not support such a theory. This is not a case where a defense attorney completely neglected an obvious avenue of defense. Rather, the evidence presented at the hearing in state court reasonably supports the conclusion that Slocombe's investigation and preperation for trial was reasonable given the information he received. Moreover, the trial court concluded that Slocombe's cross-examination and opening and closing revealed that he was prepared. This Court agrees. Any fair reading of the trial record shows that Slocombe was not ill-prepared for trial.

Petitioner also asserts that Slocombe was ineffective for failing to obtain all the CT scans and MRIs. At the state court hearing, Slocombe testified that none of the experts he consulted asked for these additional records. It was reasonable for Slocombe to rely on the professional judgment of the medical experts he consulted as to what records were necessary for them to review. And, more to the point, it was reasonable for the state court to reject this allegation based on the evidence produced at the hearing.

## B. Conflict of Interest

Petitioner next alleges that his attorney's personal troubles created a conflict of interest,

causing him to rush Petitioner's case through court and keep it off of his books. He asserts that he is entitled to relief on this ground without the need to affirmatively show that he was prejudiced by his counsel's conflict.

"Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 348 (1980) (holding that to establish a Sixth Amendment violation resulting from the joint representation of multiple defendants by a single attorney, a defendant who fails to object at trial must demonstrate an actual conflict of interest that adversely affected his attorney's performance) (footnote omitted)).

The rule that proof of prejudice is excused when the lawyer is burdened by a conflict of interest has been limited to cases where the conflict arises from multiple representation. *See Mickens v. Taylor*, 535 U.S. 162, 167-69 (2002). In *Mickens*, the Court refused to extend the rule beyond that factual circumstance, stating that although the *Sullivan* rule had been applied "unblinkingly" to various kinds of conflicts of interest that did not involve multiple representation, *Sullivan* "does not clearly establish, or indeed even support, such expansive application." *Id*. at 174-75. The Court reasoned that *Sullivan* and *Holloway v. Arkansas*, 435 U.S. 475 (1978), "stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice." *Ibid*. However, the Court believed that "[n]ot all attorney conflicts present comparable difficulties" and concluded that it remained an "open question" whether *Sullivan* should be extended to cases other than multiple representation. *Id*. at 175-76.

After *Mickens*, the Sixth Circuit has been reluctant to apply the *Sullivan* rule to conflicts

19

of interest that do not arise from multiple representation. In *Smith v. Hofbauer*, 312 F.3d 809, 817 (6th Cir. 2002), the court held that a habeas petitioner was not relieved of the requirement of showing prejudice under *Sullivan* for an ineffective assistance of counsel claim based a conflict of interest that arose from other than multiple representation.  Other cases have come to the same conclusion. *See Harrison v. Motley*, 478 F.3d 750, 756-57 (6th Cir. 2007) (holding that neither *Sullivan* nor *Holloway* applied to the petitioner's claim that his lawyers had a conflict of interest in representing him based on their fears of criminal prosecution and malpractice for witness tampering); *Stewart v. Wolfenbarger*, 468 F.3d 338, 351 (6th Cir. 2006) ("This Court has consistently held that, for Section 2254 cases, the *Sullivan* standard does not apply to claims of conflict of interest other than multiple concurrent representation; in such cases, including successive representation, the *Strickland* standard applies."); *Whiting v. Burt*, 395 F.3d 602, 619 (6th Cir. 2005) (finding the presumed prejudice standard inapplicable to an attorney's alleged conflict from representing the petitioner at trial and on appeal); *Moss v. United States*, 323 F.3d 445, 473 n. 25 (6th Cir. 2003) ("As we have discussed, supra, the *Mickens* rationale compels our strong hesitation to apply Sullivan to conflicts of interest cases arising outside of the joint representation context.").  In this case, expanding the presumed prejudice standard of *Cuyler v. Sullivan* "beyond its present borders of multiple concurrent representation would result in the creation of a new rule of law — one that clearly has not been dictated by prior Supreme Court precedent." *Whiting*, 395 F.3d at 619.

Here, Petitioner's alleged conflict of interest does not result from multiple concurrent representation of joint defendants at the same trial.  The presumed prejudice rule of  *Cuyler v. Sullivan* is therefore inapplicable to his conflict of interest claim.  Instead, the proper standard is the *Strickland* standard, in which Petitioner must demonstrate that he was actually prejudiced by

counsel's alleged conflict of interest.

At the evidentiary hearing on Petitioner's ineffective assistance of counsel claim, defense counsel denied that he wanted to resolve Petitioner's case quickly for personal reasons. He also denied litigating Petitioner's case off the books.  The judgment against Slocombe in the civil legal malpractice case filed by Sam Field was entered in June, 2000.  The trial in Petitioner's case took place over five years later.  The Michigan trial court acknowledged that Slocombe may have been avoiding creditors, but it found that there was no evidence that shows that it affected his preparation for trial or provided an incentive to do a poor job for his clients.

The only evidence Petitioner offers as to actual prejudice is the testimony that his attorney advised him to plead guilty at the preliminary examination to avoid possible murder charges.  The plea did not occur, and instead, counsel conducted a reasonable investigation into Petitioner's case, and his performance at trial does not suggest that he was rushing the case along.  This claim was reasonably rejected by the state courts.

## C.  Failure to Call Expert Witnesses

Finally, Petitioner asserts that his counsel was ineffective for failing to call defense experts such as the two discovered by his appellate counsel.

Although "in some cases counsel would be deemed ineffective for failing to consult or rely on experts, . . . that formulation is sufficiently general that state courts would have wide latitude in applying it." *Richter*, 131 S. Ct. at 789.  *Strickland* does not require an equal and opposite expert from the defense for every prosecution expert. *Id.* at 791.  "There are . . . 'countless ways to provide effective assistance in any given case,'" and it is a rare situation "in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id.* at 788-89 (quoting *Strickland*, 466 U.S. at 689).

21

The fact that Petitioner's appellate counsel located two potential expert witnesses that trial counsel did not discover does not mean that trial counsel's investigation was deficient. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 131 S.Ct. at 789. The record shows that trial counsel did, in fact, vigorously investigate the possibility of using an expert witness in Petitioner's defense.  He talked with local physicians, and he had one of those physicians "shop" Petitioner's case around.  That search did not yield anything supportive of Petitioner's defense, and no physician was willing to testify in Petitioner's defense.  Likewise, the expert obtained from TASA did not support Petitioner's defense.  That expert discounted the possibility that the complainant's injury was an old one, and therefore he at least indirectly supported the theory advanced by the prosecution's experts.  After the leads proved unfruitful–and indeed seemed to confirm what the prosecution's experts were saying–it was reasonable for trial counsel to move on and prepare a defense based on Petitioner's version of events. *See Flick v. Warren*, 2012 WL 603761 *3 (6th Cir. Feb. 27, 2012) (Trial counsel was not ineffective because he decided no to seek an expert on shaken baby syndrome only after he had contacted three doctors seeking help with the case who gave him unfavorable responses).

Turning to the reports of the defense experts located by Petitioner's appellate counsel, it was reasonable for the state court to conclude that Petitioner was not prejudiced by the failure to present these opinions. Dr. Herbst's review of the medical records and images led him to conclude that there was new blood and old blood, indicating the possibility of a chronic subdural hematoma.  The prosecution responded to this theory in the state courts with a letter written by Dr. Schermerhorn, who had operated on Cameron.  Schermerhorn stated that the differeing levels of blood density could also represent trapped cerebral spinal fluid. This possibility is also

mentioned in an article provided by Petitioner and appended to his petition entitled "Intracranial Hemorrhage and Rebleeding in Suspected Victims of Abusive Head Trauma: Addressing the Forensic Controversies." That article discusses acute subdural hemorrhages, which do not appear to be of uniform density on CT imaging, stating that "[l]eakage of cerebro-spinal fluid" may account for such non-uniformity and that "a hyperacute subdural may also reveal high- and low-density components that are arranged concentrically or intermixed." Petitioner's Dkt. 1, Exhibit 8, 64-65. "These mixed-density, hyperacute collections are frequently misinterpreted as chronic subdural hematoma with rehemorrhage." Id. at 166. Likewise, "an evolving subdural hemorrhage may demonstrate heterogeneity from one region to another over time within a single subdural collection." Id. In other words, Dr. Herbst's opinion was not the final word on the matter, and the prosecutor would have been able to rebut and explain his proposed testimony.

Dr. Rothfeder's letter indicates that the opinions of the prosecutor's experts regarding the amount of force required to produce the injuries was invalid because it was not supported with an analysis of the biomechanics involved. First, Petitioner's trial counsel raised this point on cross-examination of the prosecutor's experts. Moreover, the letter does not take into account the fact that the opinions of the prosecutor's experts were based on their extensive professional experience working with injuries. Lastly, the letter ignores Petitioner's evolving story of how the complainant was injured, belying his credibility. In his final version, Petitioner admitted that he dropped Cameron on the floor after he became "disgusted" with the vomit. The detective testified that Petitioner made a tossing motion when he described how he dropped Cameron. Cameron also sustained retinal hemorrhages and a fractured clavicle which resulted from a trauma to his chest. There is no reasonable probability that the outcome of Petitioner's trial would have been more favorable to him had Rothfeder's opinion been presented to the jury.

23

Neither the trial court nor the Michigan appellate court's decision was contrary to, or involved an unreasonable application of, clearly established law as determined by the Supreme Court of the United States. Therefore, this Court denies Petitioner's petition for a writ of habeas corpus.

## V.  Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009:

> The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2).  If the court denies a certificate, a party may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.

> Rule 11, Rules Governing Section 2254 Proceedings.

When a district court denies a habeas petition a certificate of appealability should issue only if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In the present case, for reasons stated in greater detail in the opinion and order denying the petition, this Court found that Petitioner's application for a writ of habeas corpus is meritless.  The Court will deny petitioner a certificate of appealability with respect to his claims because reasonable jurists would not find it debatable whether this Court was correct in determining that the petition should be denied.

24

**VI. Conclusion**

Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas

corpus.  The Court further **DENIES** a certificate of appealability.

**SO ORDERED.**

S/Paul D. Borman

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 6, 2012

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
March 6, 2012.

S/Denise Goodine

Case Manager

25